Ms. Rasmussen. Good morning, Your Honors. May it please the Court, I am Robin Rasmussen of Nicholsville, Rasmussen & Mead, and I am here today with the distinct honor and privilege to represent All-American Check Cashing in its ongoing struggle against the Mississippi Department of Banking and Consumer Finance and that department's unconstitutional persecution of All-American. At this moment, I would like to reserve five minutes for rebuttal, if I might. Yes, you are ready to stand up. Thank you. I would like to address the Court today on the District Court's misapplication of the Younger Abstention Document. In all the talk about abstention, it seems that the one thing that has been forgotten is that abstention is the exception to federal court hearing cases rather than the rule. All-American was forced to seek the protection of the District Court because of the department's ongoing assault on All-American's constitutional rights, an assault which continues today due to the District Court's erroneous abstention. The initial point I would like to discuss with this Court is the department's violation of its own statutes, specifically the Mississippi Check Cashers Act, as well as the Mississippi Administrative Procedures Act. These violations by the department are per se violations of All-American's due process rights, entitling All-American to the protection of the federal courts. First, the department demanded a $3 million fine and a revocation of 42 licenses issued to check cashers in the state of Mississippi. This demand in and of itself is a violation of the Mississippi Check Cashers Act. That act, which the department purports to enforce, requires each location to be a separate licensee to provide separate documents and to keep separate records. That's what All-American does. The department, in June of 2014, raided a substantially smaller number of stores than all 42 licensees. It now purports to fine $3 million All-American, based off of the and revoke 42 licenses. It hasn't even investigated 42 licensees. That attempt, in and of itself, is a violation of the department's enforcement powers of the Mississippi Check Cashers Act. But if the procedure was the same at all 42, are you insisting that they go physically inspect 42 different locations? Yes, Your Honor. That's exactly what I'm saying. What if the procedure is the same for all of them? I beg your pardon? If the procedure that is being objected to is the same for all and the actions that were taken that were in violation of the statute were the same at all 42 locations, why would they need to inspect all 42? Because they're separate, independent licensees, Your Honor. But they're operating the same. They're operating the same way, isn't that correct? The procedures were the same? The procedures are the same, but violations may or may not be the same. All-American, and as has been shown to the department, its policies and procedures specifically instruct its employees to follow the law, to not take rollovers, which is one of the things the department has alleged. What a store does in Columbus may not be the same thing that a store does in, say, Duffport or Pascagoula or McGee or in any of the other 42 locations where All-American has independent licensees. The statute doesn't say licensees plural. It says licensees singular. The department may investigate a licensee, may go into that store, it may look at that store's books and records. The department's attempt to wholesale sweep 42 stores into 12 investigations is a violation of that statute. If it's a violation of the statute, a state statute, how is it a violation of the constitutional rights? Because, Your Honor, a violation of a state statute is a per se violation of All-American's due process rights. That's what this Court said in— And why can't there be a remedy within the state system? Why must we jump over to the federal system because the state is not following its exact rules and regulations? Because the state, this department, does not have any procedures, published or otherwise, that protect All-American's due process rights in the department's raids and attempts to find it out of existence and revoke its licenses. One of the things that the— Didn't you have a right to a hearing? Couldn't you bring this to the attention of the Commission at a hearing? You were given the opportunity to request a hearing if you wanted one, and you didn't take advantage of that opportunity to go before the Commission and complain that they weren't following their own procedures. Thank you, Your Honor. Actually, what the statute says is that fines and license—fines can be implemented and licenses can be revoked only after the department issues a notice that it intends to do that and provides an opportunity for a hearing. At the time this was not done that. The department had not issued a notice. It had issued suggestions. It had said, well, this is what we think, this is what we believe, but it had not sent a notice or set a hearing. It has since done that, Your Honor. It did that in June after these briefs were filed, and quite frankly, the department continues with its violations. The department is relying upon a 19— Was there a hearing in June? No, ma'am. There's been no hearing yet. There's a hearing set November the 16th, 17th, 18th, 22nd, and maybe after that. The department issued a notice subsequent to the filing of these briefs of a notice and hearing. I submit to Your Honors that that doesn't comply with the statute. The department issued that notice based on a 1996 rule, which the district court unfortunately mistakenly found was still in effect at the time all of this occurred, and Your Honors, it was not. It was not in effect. The department had issued some regulations consistent with its statutes that were published with the Mississippi—according to the Mississippi Administrative Procedures Act, and in those regulations, the department specifically said that all prior regulations had been invalidated and revoked, and you can find that at, on the record, 60-60178.197, I think is where that specific regulation is. So, this hearing procedure, which, upon which the department relied in the district court and subsequent, has been invalidated. So there's no hearing procedure? Is that your position? No, ma'am. There's not, and that is precisely why we are here today, because the department only gets its powers through the statute. It can't just make stuff up. I thought there were hearing procedures listed on the department's website. Yes, ma'am. Those are the 1996 procedures that we're talking about. Right, and you're saying they're not in effect anymore? Yes, that's exactly what I'm saying. What did they notice the hearing in later November under? I'm sorry? What authority did they use to notice the November hearing? Those hearing procedures that you just referred to. Okay. So they are in effect? I beg your pardon? They are in effect. You said they weren't in effect anymore. No, they're not. That's what the department used, Your Honor, but the department's own regulations say that those procedures were invalidated back in 2003, and the department has never promulgated new hearing rules, not since 1996. Now, yes, that's what they went under, but I submit to Your Honor that those rules are invalid. In addition, even though those rules were allegedly published on the department's website, that's not the proper place for the rules to be published under the Mississippi Administrative Procedures Act. That act requires that all agencies' rules be published with the Mississippi Secretary of State, and then the Secretary of State promulgates all the rules on its website. Citizens should not have to go digging through multiple different websites to find the rules upon which they are subjected to, particularly, Your Honor, in a case where a department, a governmental agency, is running roughshod over an individual's, and here I use All American as an individual's, liberty rights. And I'll give you one example. For instance, the regulations that the department actually promulgated allow the department to look at books and records, and it allows the department to summon witnesses to give testimony under oath. What it does not allow, in any way, shape, or form, is for an examiner to walk into a store and ask to conduct custodial interviews of employees, nor does it allow examiners to corral, if you will, All American's customers and offer them money if they will fill out a form that has been drafted by the department outside of its normal questionnaires. And I suggest to you, Your Honors, that the department is simply a department that is out of control. It doesn't follow its own rules, even when they are published, and then it makes up what it wants to do as it goes along. And that's why All American needs the protection of the federal courts. And I'll wrap back around to what I said originally. The Younger Exception Doctrine that was applied by the lower court is an exception. The general rule is that the courts hear what's brought before them. In this case, the district court erred not only in its finding of the three Younger Requirements, but it also erred in its finding of the exceptions. And I'd like to take the last couple minutes to talk about bias, if I might. One of the reasons is the judicial or the decider can, is biased against the, or has some bias that she cannot act impartially. There's been a lot of talk about the commissioner's pecuniary bias because of the unprecedented fines the department proposes. But she has another bias as well. In her own regulations, she says that the commissioner is responsible for all of the acts of her examiners and her employees. I submit to Your Honor that in light of the allegations, which are undisputed at this point, that the commissioner cannot impartially sit in judgment of All American when all of the evidence supposedly to be provided has been gleaned or created by the department's own, the commissioner's, excuse me, own employees. And her own examiners with which she has some kind of relationship. At some point in time You gathered the information from the employees. I'm sorry, ma'am. You said they took statements from employees and customers. They didn't create it. I'm sorry. I meant her own employees. And I would argue, Your Honor, that there was some creation of testimony by the department examiners. I suggest to you, Your Honor, that there are allegations in the complaint that that's exactly what the examiners did. Before they, I see my time's almost up, Your Honor. If you want me to finish, I will. Before the examiners went in, the department created a special questionnaire, which it then presented to customers and had them, told them what they were going to do. And what numbers to put in the blanks, and told them that they would be, could receive money if they filled out this form. All right. If I may ask one more question. Sure. Why wasn't there a remedy available going through state court? That is a great question, Your Honor. We don't know that there's a remedy going through state court. And here's why. When all this notice of, when all this hearing thing came up about November, we asked the question, what happens if the commissioner rules against All-American? Do those rulings immediately go into effect? The answer was, yes they do. If those rulings automatically go into effect, all 42 licenses are revoked, All-American is essentially out of business, and there is no remedy in state court. There is none. And because of that, Your Honors, we urge you to exercise this court's inherent powers and grant the injunction that All-American requested at the district court, because of what has happened since then. All right. Thank you. Thank you. Mr. Matheny. How do you say your name? Matheny, Your Honor.  I'm here in the Attorney General's office on behalf of the defendant's appellees, here with my colleague, Doug Miracle. And may it please the court, I think that this case checks all the boxes for younger abstention, and All-American failed to prove that any exceptions apply. I'd like to start out by, before hitting the points that I wanted to hit on today, I want to address some of the questions and some of the new things that we've heard for the first time today here at this argument. First point, kind of working backward, Judge Prado, your question about why not go to state court. They can absolutely go to state court. That's the adequate opportunity prong. And it's addressed in our briefs, and it's clear they can raise these issues that they're raising in the commission's proceeding. They can also take an appeal to state court. That's clear at the electronic data systems case and the Tillman case from the Mississippi Supreme Court cited in our briefs cover that issue. I saw that you cite the case, and I confess I haven't read them. Is there a statutory provision that gives the right of appeal? No. And the good question, Your Honor, the way that it works in Mississippi is this. If there's a statutory right of appeal, then obviously the statute will say where you have to file, circuit or chancery court, and set out the procedures for that. If there's not a statute, then the default rule, if you will, is that you can file in chancery court to appeal for an administrative agency. That's well established, and that's what applies here. It's what Judge Lee found below. And I didn't think that there's any real dispute about that. And does the chancery court authorize to stay a fine pending appeal? I certainly think so. The chancery court, it's almost as if it's a new proceeding. The chancery court, they can make their arguments about staying. They can make their arguments. The standard of review, I think, is set forth in both those two cases referenced in our brief. But they can raise the constitutional questions that they've got. They can raise the statutory questions that they've got. And they can challenge the commissioner's findings under well-established standard of review that applies whenever Mississippi courts review agency decisions. Some other things that were mentioned that need to be addressed. I'm a little bit perplexed by the argument that the department violated Mississippi law in conducting investigations and performing the investigations back in June of 2014. And the reason why I'm particularly perplexed about that is that if the argument is that the department violated state law, and I think Judge Prado, one of your questions was touching on this. I mean, that runs us into a pinhurst problem when we're talking about did they violate state law. Did an agency of the state violate state law? As to the APA argument in this talk about the 1996 rules and does the department have any proper hearing procedures, their argument all along has been that no procedures exist. And here's the facts that underlie it. In 1996, late 1996, early 1997, the department promulgated its hearing, notice and hearing rules for all proceedings that are conducted at the department. It did so under the Mississippi Administrative Procedures Law that was in effect at the time. And you'll see in the record around pages 77 and 78, you'll see that those regulations were submitted to the Mississippi Secretary of State's office. In the early 2000s, and specifically I believe it was in 2003, the Mississippi Legislature amended the Mississippi Administrative Procedures Law and set forth some requirements about when agencies promulgate rules that they would have to do so by, I think it's in July of 2005, they would have to promulgate rules and submit those to the Secretary of State. Importantly, and Judge Lee picked up on this, and in fact it's also in Judge Southwick's Treatise on Administrative Law in Mississippi that's cited in our brief, but the statutes enacted by the legislature in 2003 specifically say that nothing in this chapter affects the validity of rules and regulations adopted prior to the 2003 Act. She mentioned, counsel mentioned that they were automatically voided when the new regulations went into effect. Is that, that it's specifically mentioned in the new statute or regulations that the old rules no longer apply? Is that? There's two problems with what she was saying, I think you were hitting on. The first thing is Judge Lee addressed this if you look at footnote 13 of his order. I think that what their argument is that after 2005, when agencies were to submit rules to the Secretary of State, the Secretary of State promulgated administrative procedures rules that required submission of rules by, I think, 2011. And this is where you get to the argument that you heard earlier about the Secretary of State was supposed to compile and publish a list of all the proceedings and rules. The problem with the argument is that nothing in the statute, in the 2003 statute, invalidates pre-existing rules. And as Judge Lee found, subsequent regulations enacted by the Secretary of State pursuant to the statute do not invalidate previously filed rules as well. It's, I believe when it came up in the district court below, the point was the statute doesn't invalidate the rules and a regulation promulgated by the Secretary of State pursuant to the statute doesn't invalidate the rules. It's nothing in this chapter is what the 2003 Act says about rules and regulations. What about the allegation this morning that the testimony was created by the examiners and that the customers were offered money for filling out the forms? My first reaction to that new allegation is, number one, it's not supported by the record at all. And I think one point, and this came up in the district court as well and I think it's in a footnote in my brief, they kicked off this action by filing a verified complaint. I think the CEO of the company signed off on it and said, everything I'm swearing against the department is true. Then they filed an amended complaint that was unsworn. And when they did that, I think pursuant to clear circuit precedent, it superseded the verified amended complaint. And I'm not even sure sitting here today that even the first complaint that's been superseded supports that allegation. There was certainly no argument to Judge Lee that I can recall about any of that stuff. So I think that those kind of allegations at a minimum would be something that would be procedurally barred. To the extent that counsel is referring to things that are not in our record, I don't know. I'm not involved in the administrative proceeding before the department. I don't know if that issue has come up there yet or not or if that's where they say that their proof has been developed as to that point. But what I do know is that our record for this case and what this court is reviewing, no such thing is supported by the record. All right, so we didn't miss it. No. Are these locations shut down? Are they still operating? They're still operating, Your Honor. And as far as I know, I think it was correct what counsel said about a hearing being set in November. I can also say, and I think that this is fair because it's really public record and not outside our record, the hearing has been continued several times already at All-American's request. So it's currently set. I don't know that it's actually going to go forward later this month, but that's where it stands now. All right. I'd like to focus on my two points and highlight a couple of things that what I think from the department's perspective and also from the State of Mississippi's perspective are the most important points about this case. Those two points would be, first, their ongoing proceeding argument, which frankly, it's factually and legally incorrect. But the reason that it's important is that if you buy what they're saying, I think what you're looking at is significantly narrowing Younger's application in this circuit in a way that would be inconsistent with our precedents in this circuit. And I don't think you're even supported by precedents from elsewhere. When you're looking at the ongoing proceeding prong, I think the place to start, as you do with all Younger cases, is you're looking at the principles behind Younger, the federalism and the comity, and by that I mean proper respect for State functions and State policies, avoiding duplication of effort, and the recognition that interference with State proceedings can reflect negatively on State's ability to adjudicate constitutional issues. And specifically, the ongoing proceeding element, as it fits into those principles, is that quite simply, you're checking to make sure that there is something going on that Federal relief would interfere with. It seems to make sense. The facts here, and I wouldn't belabor them, but they're in the complaint, I mean, they're in our brief, and supported by the record, and as Judge Lee found, this proceeding was clearly ongoing when they filed suit. I think that cases like the Whiteman case, the Hensler case, the more recent case, which is unpublished but still persuasive, that Judge Lee cited, the Rickoff versus Willing case, I think that those clearly show this Department proceeding was ongoing when they filed suit. The three cases that they rely on in order to try to get to this result of some kind of bright-line rule that it's a race to the courthouse sort of situation, Louisiana debating, and Judge Barksdale's opinion there has nothing to do with this case. I don't think it helps them at all. Ongoing proceeding was not a contested issue on that appeal. All you had there was the New Orleans Commission had issued or had received private complaints and issued a letter saying that they would like to investigate those complaints, but they didn't undertake any agreed not to move forward. So Louisiana debating, I think, stark contrast to here, completely in a positive. The Fourth Circuit case cited the Telco split panel decision in Telco, also in a positive here. There you had complaints to the agency, no findings of probable cause. There was a complaint to the agency and attorneys for the federal plaintiff, but what the panel in Telco seemed to rely on was that the federal plaintiff was in limbo about what to do next and what would happen while their First Amendment rights were being chilled. That's not the situation that we were in here in January of this year or later when Judge Higginson said, nobody's in limbo. The Department's always been pressing these charges and moving forward with its case. The last and the most recent case, and it's one that we're familiar with from Mississippi, but the Google case, I think, does nothing to help their case. That was the recent case, Judge Higginson's decision about the administrative subpoena. And as to the younger abstention issues in that case, the federal court filing was actually so early that the case wasn't even ripe for review. But I think the most important takeaway, and this isn't a footnote in my brief, the most important takeaway from the analysis in the Google case is that the panel there declined to establish a bright line rule and specifically ruled that an administrative subpoena without more would not justify a finding of an ongoing proceeding. Our case, frankly, is the with more part of that. Last thing on the ongoing proceeding argument and this kind of, it wasn't, it was raised for Judge Lee, but he felt like he didn't have to address it because we have such a clearly ongoing proceeding. But the Hicks versus Miranda issue about, and I think that this really explains why it's not a race to the courthouse problem. Under the Hicks line of cases, you measure whether the state proceedings are ongoing before any proceedings of substance take place in federal court. Now, in this case, no proceedings of substance in federal court have taken place. All we have is an abstention. Now, and I would clarify this, when we talk about proceedings of substance, not that our proceedings here today aren't substantive and if the proceedings below weren't substantive. You're not hurting our feelings. We're talking about the merits, substance on the merits. And those have not occurred yet here. Their reply brief cites the Despain case for their race to the courthouse contention. I think that that clearly ignores footnote 18 of the Despain case that acknowledges Hicks and it basically says, in an easy case, you can look at when the cases, you may have to dig and apply the Hicks rule. The best example, I think, of application of the Hicks rule is, Your Honor, Judge Clement, before you, or just before you took the Fifth Circuit bench, there was a decision that you had issued when you were at the district court in straight shooters versus St. Tammany Parish. It was about a nightclub with a noise ordinance. There were some citations issued and the Federal plaintiff filed suit. Then there was an arrest. And so you had the filing of the suit and actually addressed temporarily staying the State proceedings. But there were no proceedings of substance that took place before Your Honor revisited it and applied the Hicks rule. I think that that example is what we at worst in this case have here is that the ongoing proceeding is clearly ongoing today, measured against no proceedings of substance on the merits in Federal court. What about the amount of the fine, $3 million? Well, with respect to, and I think that this gets into my next, my other point, but the pecuniary bias and the exception for institutional bias that was raised below. I would point out that this, another bias argument that you heard earlier, had not been raised below. But what Judge Lee did analyze and what he looked at was, is there an institutional bias problem here because the Commissioner presides over the hearing? The things that I would point out are, one, it was their burden of proof to be able to establish it. There's a presumption that State officials will follow their oaths and be fair and impartial. And when we're talking about pecuniary interest or pecuniary bias, we're not talking about the Commissioner being able to award a fine and have that in order to her own personal benefit. Where does the money go? The money, if a fine is assessed and collected, the money would go into the State Treasury, into a fund that's established there, the Consumer Finance Fund for the Department. And who determines how it's allocated or spent? The legislature does. Not the Commissioner? Not the Commissioner. And I think that Judge Lee's order is clear on this, our briefs are clear on this, but just briefly to sum it up, the Department is not an autonomous governmental entity. It's a State agency. Penalties collected, deposited at the State Treasury and the legislature through its annual, in Mississippi we do it year by year, the budget approval and appropriations process is what governs what money that the Department can spend. The details, they're somewhat boring details, but the details of this are all contained in the record starting at the declaration from our fiscal officer at 493 and the 100 or so pages after that. But the point being is, and if you look at page 46, 47 of our brief, we put out this example of what would happen. If a fine is assessed and collected, the Department cannot spend it because it's not in their budget for this year. They don't have authority. The money would be deposited at the State Treasury and then the legislature would decide whether the Department spends it at some time in the future, they could require that the Department holds it, or, and this just happened, it happened this past legislative session, it happens quite often, the legislature can take the money and put it towards some other State program. It's State funds, that's the point. It's State funds and the legislature controls it. I see that my time is almost up. If the Court has no other questions, I would simply say that it's the Department's position that Judge Lee's opinion be affirmed in all respects. All right. Thank you. Thank you. I wanted to clear up one, perhaps, misconception. If I misspoke, I apologize to the Court. What the examiners did with the customers is they didn't say, we'll give you money if you fill out the form. They said, if you fill out this form, you may get money. So, if I misinterpreted or misrepresented that, I apologize to the Court. That was not my intention. Now, first of all, a couple of things. I will, if I can, this is at the record, 16.60178.182. These are the Department's published regulations regarding the Mississippi Check Cashers Act. While these, and these were done in 2003, Your Honors, while these regulations are intended to and do supersede all prior regulations issued by the Department of Banking regarding the check cashing industry, these regulations are intended only to clarify the existing law. I submit to Your Honors that the Department's own regulations, where they actually did what they were supposed to do, invalidated that 1996 hearing rule. Now, the other thing I want to talk about is the footnote 13. And again, Judge Lee missed it. It was a mistake. It was a mistake either under a de novo or an abuse of discretion when he found that the Department's 1996 hearing rules applied. That, in and of itself, is a violation of all Americans' due process rights and thus requires federal intervention to protect this citizen's rights. The other thing I want to remind the Court is, I think the younger exceptions and applications have been fully briefed, so I don't want to spend a lot of time on that. But one thing that we have to talk about is the irreparable harm, immediate and serious, that will occur to all Americans in the event that the Commissioner revokes the licenses. Contrary to Mr. Matheny's argument, if the Commissioner revokes those licenses, by the time you get to Chancery Court or Circuit Court, wherever it is, that decision has already been implemented. Why can't you go in with a TRO or a motion to stay immediately? You can, Your Honor, but by that time, all Americans already closed down. That's true of virtually every agency proceeding state and federal across the 50 states. And we don't all run to federal court and say, wait a minute, just because we might not get relief immediately, we get to get an injunction from a federal court. Yes, Your Honor. Now, that would invalidate every state agency proceeding across the board, wouldn't it? Except that the other state proceedings have published rules that you can depend upon that you know will be followed. In this case, the Department has demonstrated that it doesn't follow either its own rules or anyone else's rules. So there can be no confidence. Well, but you can go to court, can't you? I mean, you have the right to go to court. It's state court. Following the . . . Immediately, within, you know, hours. You could go to Chancery Court and file a TR application for TRO, a stay. You have access to the courts, don't you, where you can raise your constitutional challenges. Yes, Your Honor, but by that time, it's . . . I mean, you're assuming that the Chancery Court will act quickly enough that all Americans . . . But my problem is that's true in every state administrative . . . I don't know about every state administrative process, Your Honor. I'm only dealing with what the Department does. Let me just tell you that . . . Okay. You don't automatically get a stay of a fine under state administrative law. I mean, a lot of states say, yes, you can move to suspend or whatever, but there's no constitutional right to have review before a fine is imposed. No, Your Honor, but there is a constitutional right to have your constitutional concerns heard. And I submit to Your Honor that the Department's actions . . . I'm out of time. May I continue? You can finish your sentence. Okay. Thank you. I think we know what you're going to say. Okay.  The Department itself is not interested in maintaining either all Americans' constitutional rights or following any of the rules that would afford all American appropriate due process. All right. Thank you.